

FILED

Sep 06 2023, 8:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Justin R. Wall
Wall Legal Services
Huntington, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Kelly A. Loy
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Matthew D. Englehardt,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

September 6, 2023

Court of Appeals Case No.
22A-CR-1760

Appeal from the Wells Circuit
Court

The Honorable Kenton W.
Kiracofe, Judge

Trial Court Cause No.
90C01-2101-F4-6

**Opinion by Judge Bailey**
Judge Crone concurs with separate opinion.
Judge Kenworthy dissents with separate opinion.

**Bailey, Judge.**

## Case Summary

[1] Matthew Englehardt appeals his convictions and corresponding ten-year sentence for one count of sexual misconduct with a minor, as a Level four felony;[1] and three counts of sexual misconduct with a minor, as Level 5 felonies.[2] Englehardt raises four issues for our review, but we find only one dispositive: whether the trial court abused its discretion and, thus, subjected Englehardt to double jeopardy when it granted the State's motion for a mistrial. We reverse.

## Facts and Procedural History

[2] Englehardt was previously married to Danielle Dues. During the marriage, on April 20, 2005, M.V.1[3] was born. Following the dissolution of the marriage, M.V.1 lived with Dues but would visit Englehardt every other weekend. In June 2020, M.V.1 reported to Dues that Englehardt had touched her inappropriately and forced her to touch him inappropriately on one occasion while she was staying at Englehardt's house. Dues immediately took M.V.1 to speak with a local police officer, who recommended that Dues take M.V.1 to a sexual assault treatment center.

---

[1] Ind. Code § 35-42-4-9(a)(1) (2022).

[2] I.C. § 35-42-4-9(b)(1).

[3] The transcript refers to the child as M.V.1 instead of using her initials. For the sake of consistency and clarity, will also refer to her as M.V.1.

[3] Based on M.V.1's report, the State charged Englehardt with one count of sexual misconduct with a minor, as a Level 4 felony, and three counts of sexual misconduct with a minor, as Level 5 felonies. The trial court scheduled a trial for October 18, 2021. On October 14, the State filed a motion in limine seeking to prohibit Englehardt from presenting any evidence regarding "the character for truthfulness or untruthfulness of any witness or presenting any extrinsic evidence to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness[.]" Appellant's App. Vol. 2 at 87. The court granted that motion, and the jury trial proceeded as scheduled.

[4] Toward the end of the second day of the trial, the State rested, and Englehardt began his presentation of evidence in his defense. Prior to Englehardt calling Holly Johnson as a witness, the court held a hearing regarding the State's motion in limine. The court then allowed Englehardt to present Johnson's testimony outside the presence of the jury as an offer of proof. Johnson testified that M.V.1 "feeds off of negative attention" and "wants drama" and that she had recently "lied about somethin[g]," which caused her to lose her phone privileges. *Id.* at 215. Following the offer of proof, the court ruled that Johnson's testimony regarding M.V.1's character for truthfulness was not admissible, but the court determined that she could testify regarding her observations of M.V.1 around the dates in question as well as her familiarity with the house and any physical limitations Englehardt may have.

[5] At the start of the third day of the jury trial, Englehardt called Johnson as a witness. Johnson testified in front of the jury that she had worked for the

Indiana Department of Child Services ("DCS") for almost nine years and that she is "pretty familiar" with children. Tr. Vol. 3 at 241. She then testified that she had been in a relationship with Englehardt from the fall of 2010 through February of 2014; that she had a child, M.E., with Englehardt; and that she had helped raise his other children, including M.V.1. Specifically, she testified that she was "[p]retty involved" with the children's lives. *Id*. at 242. Englehardt then asked Johnson: "When you helped take care of 'em, would you help with things like baths and things like that?" *Id*. Johnson responded in the affirmative, and Englehardt asked how often she would do that. She replied:

> I usually did all the baths, just from my own personal job experience, just so that way--um . . . nothing can ever come out that anything has happened, just because I've learned from my history of my job. Um--there's also just some concerns about M.V.1's behavior that--I--we just wanted to be more cautious—.

*Id*.

[6]     The State objected to that testimony on the ground that it violated the motion in limine. Outside the presence of the jury, the State moved for a mistrial and argued that it "can't unring . . . that bell[.]" *Id*. at 249. The court then asked if a limiting instruction plus a jury admonishment would work. The State responded that Johnson's testimony was "not just a simple violation" but that it "just went right at [M.V.1's] credibility that . . . her own father wouldn't give her baths because [a] DCS worker didn't trust her based upon her personality." Tr. Vol. 4 at 10. The court then determined that Johnson's testimony "implies that there [was] some reason to doubt [M.V.1] and . . . it's an opinion about,

essentially, her . . . credibility." *Id*. at 20. The court then found that, while "[o]rdinarily a limiting instruction would likely be sufficient," Johnson's "status as a DCS worker" might cause the jury to place too much "emphasis" on her testimony or "speculate why [Englehardt] and a DCS caseworker had made a decision that a father could not bathe his own children." *Id*. at 20. The court found that a mistrial was a "manifest necessity" to provide the State with a fair trial. *Id*. at 21. Accordingly, the court granted the State's motion for a mistrial and scheduled a new trial to begin on May 10, 2022.

[7] At the conclusion of the second trial, the jury found Englehardt guilty as charged, and the court entered judgment of conviction accordingly. Following a hearing, the court sentenced Englehardt to an aggregate sentence of ten years and ordered him to register as a sex offender for life. This appeal ensued.

## Discussion and Decision

[8] Englehardt challenges the court's order granting the State's motion for a mistrial. Specifically, Englehardt contends that there was no manifest necessity for the court to declare a mistrial and that his subsequent trial subjected him to procedural double jeopardy.

[9] The Fifth Amendment to the United States Constitution prohibits the State from placing a defendant in jeopardy twice for the same offense. *Brown v. State,* 703 N.E.2d 1010, 1015 (Ind. 1998). Jeopardy attaches when a jury has been selected and sworn. *Id*. at 1014. And "[o]nce jeopardy has attached, the trial

court may not grant a mistrial over a defendant's objection unless 'manifest necessity' for the mistrial is found." *Id*. at 1015 (quoting *Arizona v. Washington*, 434 U.S. 497, 505 (1978)). Absent manifest necessity, the discharge of the jury operates as an acquittal to bar further prosecution. *Id*.

[10] Nevertheless, our Supreme Court has explained that an explicit finding of manifest necessity is unnecessary and manifest necessity does not mean that a mistrial had to be necessary in "'a strict, literal sense.'" *Jackson v. State*, 925 N.E.2d 369, 373 (Ind. 2010) (quoting *Washington*, 434 U.S. at 511). Nor is the trial court required to state that it considered alternative solutions but found them inadequate. *Id*. Rather, "only a 'high degree' of necessity is required to conclude that a mistrial is appropriate." *Id*. (quoting *Washington*, 434 U.S. at 506). Moreover, "the reviewing court must 'accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by [an] improper comment.'" *Id*. (quoting *Washington*, 434 U.S. at 511). Accordingly, we "review a grant of mistrial for abuse of discretion." *Jackson v. State*, 925 N.E.2d 369, 373 (Ind. 2010). However, a "mistrial is an extreme remedy that is warranted only when no other curative action can be expected to remedy the situation." *Baumholser v. State*, 186 N.E.3d 684, 692 (Ind. Ct. App. 2022).

[11] A variety of factors may bear on the need for a mistrial. *Jackson*, 925 N.E.2d at 373. One significant factor is the extent to which the need for the mistrial is attributable to the State. *Id*. If the reason is attributable to the State, it must demonstrate a "much higher" degree of necessity for the mistrial. *Id*. Another

factor is the necessity of the mistrial in light of the steps taken by the trial court to avoid the mistrial. *Id*. at 374. This factor encompasses considerations such as whether the trial court provided counsel the opportunity to be heard, considered alternatives, and made its decision after adequate reflection. *Id*. A third factor to consider is the burden imposed by a mistrial. *Id*. The relevant focus is upon "the values underlying the protection against double jeopardy – the burden on the accused, the associated stigmatization as one accused, and the increased risk of wrongful conviction." *Id*. These values should be weighed against allowing the State "'one complete opportunity for a conviction.'" *Id*. (quoting *Brown*, 703 N.E.2d at 1016). Moreover, the values underlying double jeopardy protection "'are not as great when the trial is terminated shortly after jeopardy has attached as opposed to at a later stage in the trial.'" *Id*. (quoting *Brown*, 703 N.E.2d at 1016).

[12] Englehardt concedes that "the trial court undertook much effort in allowing the parties" to be heard on the issue of Johnson's testimony. Appellant's Br. at 21. He further concedes that Johnson "was his witness, not the State's[.]" *Id*. at 22. Nonetheless, he asserts that there was no manifest necessity for a mistrial because he "did not directly [e]licit" Johnson's response, his trial "was well underway" when Johnson testified, and Johnson's testimony was "very vague and in no way impugn[ed] M.V.1's character[.]" *Id*. And Englehardt asserts that, even if Johnson's testimony "attack[ed] M.V.1's character and credibility," the "proper course of action" would have been to strike the testimony and give a limiting instruction to the jury. *Id*. at 23. We must agree.

[13]     The challenged testimony here is the statement by Johnson, on the third day of trial, that she usually handled bathing the children, including M.V.1, when she was in a relationship with Englehardt.  In particular, she testified that she handled that task as a result of her job working for DCS, so that "nothing can ever come out that anything has happened," and because of "concerns of M.V.1's behavior[.]"  Tr. Vol. 3 at 242.  We agree with Englehardt that that testimony is "vague" and does not imply that M.V.1 is dishonest or would falsely accuse her father of inappropriate actions.  Rather, the implication from that testimony is that she handled bathing the children because she was familiar with children as a result of her job with DCS.

[14]     Further, while Johnson testified in the offer of proof that M.V.1 had a history of lying, she did not provide that testimony in front of the jury.  Again, the only challenged testimony that the jury heard was Johnson's testimony that she had previously handled the baths while she was in relationship with Englehardt— when M.V.1 was between five and nine years old—because of her job, her familiarity with children, and nonspecific concerns about M.V.1.  Nothing about that testimony demonstrated to the jury that M.V.1 had a character for untruthfulness.  We do not see anything egregious about Johnson's testimony, let alone anything so egregious as to warrant a finding of manifest necessity.

[15]     Indeed, the trial court seemed to acknowledge that the substance of Johnson's testimony itself was not problematic.  The court found that "[o]rdinarily a limiting instruction would likely be sufficient to cure any improper statement of the Defense witness[.]"  Tr. Vol. 4 at 20.  Nonetheless, the court relied almost

exclusively on the fact that Johnson was a DCS case worker to support its determination that a mistrial was needed because the jury "might" place too much emphasis on her testimony or because the jury may "speculate" as to why a father could not bathe his own child. *Id.*

[16]    However, we first note that, while Johnson testified that she worked for DCS as a case worker, she simply testified that she "work[ed] with families to make sure they have everything that they need" and to "be a support for families." Tr. Vol. 3 at 241. And, while she testified that she was "pretty familiar with kids," she did not give any testimony to either explicitly or implicitly indicate that she worked with children who had been victims of sexual assault or who would falsely implicate individuals of committing inappropriate sexual acts. Stated differently, the jury could have simply inferred that Johnson had handled the baths because she was trained to work with children, not because M.V.1 was dishonest or likely to fabricate allegations against her father. Thus, the fact that Johnson worked for DCS does not automatically make her testimony inappropriate.

[17]    In any event, even if Johnson's testimony did attack M.V.1's credibility, Indiana Evidence Rule 608(a) specifically provides that a "witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character." In addition, our Supreme Court has held that a person may testify about his or her opinion regarding another's character for truthfulness or untruthfulness if it stems from the testifying

witness' personal knowledge of that character. *See Hayko v. State*, 211 N.E.3d 483, 489 (Ind. 2023). And there is no dispute that Johnson had personal knowledge of M.V.1. Thus, Johnson's testimony was not per se prohibited. To the extent it violated the motion in limine, we see no reason why an admonishment would not have been adequate to cure any problem with Johson's brief testimony.[4] And a mistrial is only warranted when no other curative action can be expected to remedy the situation. *Baumholser*, 186 N.E.3d at 692.

[18] We also note that, while Johnson's testimony may not have been ideal for the State and indeed may have hindered its case, the question is not whether her testimony helped or hurt the prosecution. The question is whether the testimony created a manifest necessity for a mistrial. Again, Johnson's challenged testimony was given well after the jury had been empaneled and was very brief. Nothing about her minimal testimony prevented the State from presenting its evidence against Englehardt. The State elicited M.V.1's account of the allegations to the jury and presented the testimony of other witnesses to at least partially corroborate her testimony. Further, there was nothing to prevent the State from fully cross-examining Johnson about her relationship

---

[4] In its second footnote, the dissent discusses the admissibility of Johnson's testimony and notes that the court implicitly found that her testimony was prejudicial and failed the balancing test of Evidence Rule 403. However, the question is not whether her testimony was or was not relevant or whether it was or was not prejudicial. Rather, the appropriate inquiry is whether the admission of her testimony—even if it was improper under Rule 403—resulted in a manifest necessity for a mistrial. As we have discussed, we hold that Johnson's brief testimony regarding the bathing of M.V.1 several years prior to the alleged incidents was not so egregious as to warrant a mistrial.

with Englehardt and M.V.1 or highlighting the fact that Johnson's relationship with Englehardt had ended more than six and one-half years prior to the start of Englehardt's first trial. *See Hayko*, 211 N.E.3d at 490 (noting that, when party takes issue with the credibility of a witness's opinion because it is rooted in remote experiences, those concerns can be adequately addressed during cross examination).

[19] Finally, "'[w]hen the jury is property instructed, we will presume they followed such instruction.'" *Weisheit v. State*, 26 N.E.3, 20 (Ind. 2015) (quoting *Duncanson v. State*, 509 N.E.2d 182, 186 (Ind. 1987)). We therefore agree with Englehardt that the jury would have properly followed any admonishment given by the trial court to disregard the challenged testimony and to properly consider all of the evidence presented by both parties.

[20] In sum, Johnson's testimony was not so egregious as to warrant the extreme remedy of a mistrial. Accordingly, we hold that the court abused its discretion when it granted the State's motion for a mistrial. As a result, we hold that the court subjected Englehardt to procedural double jeopardy when it retried the case. We therefore reverse his convictions.

[21] Reversed.

Crone, J., concurs with separate opinion.

Kenworthy, J., dissents with separate opinion.

**Crone, Judge, concurring.**

[22] In attempting to justify the trial court's declaration of a mistrial based on a vague, isolated reference to M.V.1's "behavior" in the final stages of a three-day jury trial, the dissent claims that "several relevant facts beyond Johnson's statement are important." Slip op. at __ (Kenworthy, J., dissenting). I could not disagree more. The only matter of importance is Johnson's statement itself, which is all that the jury heard.[5] Such evidence is not inadmissible, which the dissent concedes. *See id*. at __ n.2 ("The trial court indicated that it did not believe the character evidence the defense wished to elicit was admissible 'under the case law … and the Indiana Rules of Evidence.' [] Our Supreme Court has since issued an opinion stating otherwise.") (Kenworthy, J., dissenting).[6] By definition, admissible evidence cannot create a manifest necessity for a mistrial. To conclude otherwise would gut the constitutional protection against double jeopardy, which "embraces the defendant's 'valued right to have his trial completed by a particular tribunal.'" *Washington*, 434 U.S. at 505 (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)).

---

[5] The jury was not present for the pretrial hearing, the offer of proof, or the lengthy hand-wringing that ensued after the State objected to Johnson's statement.

[6] For purposes of our analysis, it does not matter whether the trial court sincerely believed that Johnson's statement was inadmissible. The only thing that matters is whether the statement warranted a mistrial. As the lead opinion cogently explains, it did not.

**Kenworthy, Judge, dissenting.**

[23] A criminal defendant ought not be rewarded for violating a trial court's orders. The trial court here expressed clear disbelief of defense counsel's evolving explanations for her presentation of Holly Johnson's testimony. The trial court had the opportunity to observe the parties, witnesses, attorneys, and jurors as the events unfolded and, after painstaking analysis, found manifest necessity for a mistrial. For the reasons below, I would affirm the trial court on this issue[7] and respectfully dissent.

[24] First, several relevant facts beyond Johnson's statement itself are important. The trial court afforded the parties significant opportunity to be heard regarding the admissibility of defense testimony about M.V.1's character. After a pretrial hearing, the trial court preliminarily granted the State's motion in limine on this issue. *Tr. Vol. 2* at 38–44. Then, after the State rested and just prior to Englehardt calling Johnson as a witness, the parties argued their respective positions at length—the transcript indicates it was a nearly ninety-minute hearing—and Englehardt elicited testimony from Johnson during an offer of proof. *Tr. Vol. 3* at 181–235. Johnson was not asked and did not testify about her role in the household or the arrangements for bathing the children when she

---

[7] I would affirm in all respects, but for vacating two Level 5 convictions because Englehardt's acts were "so compressed in time, place, singleness of purpose, and continuity of action as to constitute a single transaction" and thus violate double jeopardy. *Powell v. State*, 151 N.E.3d 256, 264 (Ind. 2020).

and Englehardt lived together. The trial court explicitly asked defense counsel if the offer of proof covered the extent of Johnson's testimony about M.V.1's character and asked for a summary of what other testimony Johnson would provide. Defense counsel affirmed that all evidence of M.V.1's character had been covered, and provided a summary of remaining testimony, again excluding any mention of Johnson bathing M.V.1. *Id.* at 219. The trial court noted Johnson's personal opinions of M.V.1's character were largely formed when M.V.1 was "much, much younger" and "from common sense and . . . personal experience . . . a person's personality develops" from the time they are a pre-teen into adolescence. *Id.* at 234. "Her interactions over that period of time have been limited. . . . [H]er opinion of the child is based upon specific . . . instances that have been relayed to her by the child's mother and the child." *Id.* The trial court then granted the motion in limine and gave clear instructions about what Johnson could and could not testify to in front of the jury the next day, limiting the scope of Johnson's testimony to "her observations . . . that are specifically related very . . . directly to the dates in question[.]" *Id.*[8]

[25] The trial court began the third day of trial by reaffirming this ruling. Englehardt then called Johnson as a witness. Within five minutes of Johnson taking the

---

[8] The trial court indicated it did not believe the character evidence the defense wished to elicit was admissible "under the case law . . . and the Indiana Rules of Evidence." *Id.* Our Supreme Court has since issued an opinion stating otherwise. *See supra* at ¶ 17 (citing *Hayko v. State*, 211 N.E.3d 483 (Ind. 2023)). But the trial court did not have the benefit of that case during this 2021 trial, and in any event, Englehardt does not challenge the admissibility of the evidence. Further, the trial court here went beyond analysis under Evidence Rule 608, implicitly finding Johnson's testimony lacked foundation and failed the balancing test of Evidence Rule 403. *Tr. Vol. 3* at 181–235.

stand, counsel had elicited information about Johnson's experience as a DCS caseworker—as the trial court later observed, essentially trying to qualify her as something beyond a lay witness. Englehardt then asked *not one, but two* questions about Johnson's role in bathing M.V.1 while they cohabited over seven years prior, ultimately eliciting the objectionable response.[9] Defense counsel claimed her questions were not deliberately designed to violate the trial court's order,[10] but the trial court clearly did not believe her. *See generally Tr. Vol. 3* at 244–46 and *Tr. Vol. 4* at 3–13.

[26] Nearly two hours after Johnson gave her testimony—during which time the parties and court expressed their views of what happened and discussed the appropriate response, and the court had the questions and answers transcribed

---

[9]    [Defense] Q:  When you helped take care of 'em, would you help with things like baths and things like that?
A:  Yes.
Q: How often would you do that, and how often would [Englehardt] do that?
A:  I usually did all the baths, just from my own personal job experience, just so that way – um . . . nothing can ever come out that anything has happened, just because I've learned from my history of my job.  Um – there's also just some concerns of M.V.1's behavior; that – I – we just wanted to be more cautious –

*Id.* at 242.

[10] Defense counsel gave evolving explanations for her questions, claiming "I was just talking about baths; that's it," *id.* at 243; it was just to show that Johnson, not Englehardt, did the children's showers, *id.* at 244; Englehardt "wasn't doing anything inappropriate," *id.* at 245; "what happened while [Johnson] was in the home," *id.* at 246; and Englehardt's behavior and character while Johnson was in the home with him, *id.* After a recess, defense counsel claimed her questions about bathing were headed toward discussion of Englehardt's personality: "He is a guy that's more reserved . . . more calm . . . didn't like to do baths . . . wasn't a 'PDA' guy[.]" *Tr. Vol. 4* at 2.

and took a lengthy recess to consider the State's motion for mistrial—the trial court declared a mistrial:

> Ordinarily, I think a limiting instruction would likely be sufficient to cure any improper statement of the Defense witness; but I think because of her . . . status as a DCS worker[,] the jury might place too much emphasis or speculate why Father and a DCS caseworker had made a decision that a father could not bathe his own children.
>
> [T]he Defense's questions of this witness . . . that elicited the response seem . . . very removed from her purported goal of . . . rebutting the accusations of the defendant's personality; and . . . I don't know of any reason why the question would have [been] asked[.]
>
> \* \* \*
>
> While . . . it's presumed the jury will follow the instructions of the Court, in this case, we already have a situation where, following the Court's . . . decision to not allow a question from one of the jurors, the juror approached the bailiff to . . . request why his question was not given, which is . . . directly contradicted to the . . . Court's instruction that they are not to speculate why their question wasn't given.
>
> \* \* \*
>
> The Court's going to find that a mistrial is a manifest necessity to provide the State a fair trial in this case; and I am declaring a mistrial at this time[.]

*Tr. Vol. 4* at 20–21.

Second, and with those facts in mind, the United States Supreme Court has noted there is a "spectrum of trial problems which may warrant a mistrial and which vary in their amenability to appellate scrutiny[.]" *Arizona v. Washington*, 434 U.S. 497, 510 (1978). At one end of the spectrum is a mistrial prompted by State misconduct, for which the "strictest scrutiny" of the trial court's decision is appropriate. *Id.* at 508. This level of scrutiny is designed to dissuade the State from bad behavior. *See id.* at 507–08. At the other end is a mistrial declared because of a deadlocked jury, which is "accorded great deference by a reviewing court." *Id.* at 510. The Court in *Washington* held the defense counsel's improper and prejudicial remarks during opening statements fell in the area of the spectrum where "the trial judge's determination is entitled to special respect." *Id.* Based on the facts detailed above and the trial court's assessment of the defense's culpability here, this case of *defense misconduct should fall on the "special respect" end of the spectrum*.[11]

Third, in my view all the *Jackson* factors weigh in favor of affirming the trial court. *See supra* at ¶ 11 (citing 925 N.E.2d at 373). The need for a mistrial was not attributable to the State. The trial court took significant steps to avoid a

---

[11] The majority does not believe Johnson's testimony "demonstrated to the jury that M.V.1 had a character for untruthfulness." *Supra* at ¶ 14. I disagree. Johnson testifying she gave the children baths because of "concerns of M.V.1's behavior" and "so nothing can ever come out that anything has happened," especially in light of the testimony she had just offered about her job with DCS, is at minimum an implicit comment on M.V.1's character for truthfulness if not a direct aspersion. Considering Johnson's testimony as a whole, I agree with the trial court's assessment that Johnson's testimony was "an opinion about, essentially, [M.V.1's] credibility," in violation of the trial court's order. *Tr. Vol. 4* at 20. And if it was not, then her testimony about helping to bathe a six-year-old was not relevant, highly prejudicial, and had no probative value.

mistrial: it gave the parties ample opportunity to be heard, had the problematic questions and answers transcribed during a recess, and took considerable time to reflect on and decide the appropriate course. The court stated on the record it considered but rejected a limiting instruction as a viable option in part because a juror had already ignored a court instruction. And the burden on Englehardt was minimal—he had the benefit of hearing all the State's evidence but had not given his own testimony before the mistrial was declared, and although he was not retried for seven months, almost half that time was because *he* sought a continuance of the original date.

[29] Fourth, the result here undermines the rationale behind double jeopardy—to discourage bad behavior by the court and the State. *See Washington*, 434 U.S. at 507–08. Had the defense followed the trial court's order on motion in limine and the jury trial concluded in a guilty verdict, Englehardt could have appealed the exclusion of character evidence. The remedy for error in that scenario would be retrial. Instead, bad behavior by the defense here nets the ultimate reward—acquittal.

[30] And finally, "a criminal trial is, even in the best of circumstances, a complicated affair to manage." *United States v. Jorn*, 400 U.S. 470, 479–80 (1971). We give the trial court great deference because it is in "the best position to gauge the circumstances and probable impact on the jury." *Wright v. State*, 593 N.E.2d 1192, 1196 (Ind. 1992), *cert denied*. Thus, trial judges should be given latitude to deal with bad conduct in the manner they see fit or they will become reluctant to reign in improper defense conduct for fear of a retrial being barred and

"unscrupulous defense counsel [will] be allowed an unfair advantage[.]" *Washington*, 434 U.S. at 513. Another court may have made a different decision—indeed, *we* may have made a different decision—but we may not substitute our judgment for the trial court's. Rather, a trial court's evaluation of potential juror bias is entitled to "the highest degree of respect[.]" *Id.* at 511; *see Brock v. State*, 955 N.E.2d 195, 208 (Ind. 2011) (determining the trial judge did not abuse its discretion in granting a mistrial due to defense misconduct during closing argument although "another trial judge might have employed another method to reduce the effects of defense counsel's comments"), *cert. denied*.

[31] Nearly 200 years ago, the United States Supreme Court articulated the standard we still apply to a mistrial granted over the defendant's objection: courts may grant a mistrial "whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *United States v. Perez*, 22 U.S. 579, 580 (1824). Although the defendant's "right to have his trial completed by a particular tribunal" is valued, in some instances it must "be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689 (1949). Here, the trial court painstakingly weighed the circumstances and determined a mistrial was appropriate to preserve the "ends of public justice." I would affirm this finding.